IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| THOMAS J. WALLACE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Civil Action No. 10-1083 |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. INTRODUCTION**

Plaintiff, Thomas J. Wallace, seeks judicial review of a
decision of Defendant, Commissioner of Social Security ("the
Commissioner"), denying his applications for disability insurance
benefits ("DIB") and supplemental security income ("SSI") under
Titles II and XVI, respectively, of the Social Security Act, 42
U.S.C. §§ 401-433 and §§ 1381-1383f. Presently before the Court
are the parties' cross-motions for summary judgment pursuant to
Fed.R.Civ.P. 56. For the reasons set forth below, Plaintiff's
motion for summary judgment will be denied, and the Commissioner's
cross-motion for summary judgment will be granted.

**II. PROCEDURAL HISTORY**

Plaintiff filed applications for DIB and SSI on November 18,
2005, alleging disability since April 1, 2005 due to "an arm
injury, hearing loss, heart attack." (R. 113-21, 132).

1

Following the denial of Plaintiff's applications, he requested a hearing before an Administrative Law Judge ("ALJ"). (R. 65-74, 78). Plaintiff testified at the hearing which was held on October 23, 2007. A vocational expert ("VE") also testified. (R. 41-61).

The ALJ issued a decision on November 29, 2007, denying Plaintiff's applications for DIB and SSI based on her determination that Plaintiff retained the residual functional capacity ("RFC") to perform work existing in significant numbers in the national economy.[1] (R. 14-31). Plaintiff's request for review of the ALJ's decision was denied by the Appeals Council on July 2, 2010. (R. 1-5, 92-111). Thus, the ALJ's decision became the final decision of the Commissioner. This appeal followed.

III. ALJ HEARING

**Plaintiff's Testimony**

Plaintiff was born on May 25, 1951, and he is a high school graduate. (R. 44, 48). On August 9, 2007, two and a half months before the hearing, Plaintiff began working for a pharmacy. Initially, Plaintiff worked 25 to 30 hours per week; however, at the time of the hearing, he was working 35 to 40 hours per week.[2]

---

1 The Social Security Regulations define RFC as the most a disability claimant can still do despite his or her physical or mental limitations. See 20 C.F.R. § 404.1545(a).

2 When asked by the ALJ whether he thought he could work on a full-time basis, Plaintiff responded "probably." (R. 45).

Plaintiff worked behind the pharmacy counter and delivered prescriptions. (R. 44-45). Previously, Plaintiff was employed by Sun Star Plastics as an inspector of medical parts from February 19, 2007 to May 29, 2007.[3]  (R. 45-46).

In early 2004, Plaintiff fell while going into work at a Sunoco station and severely injured his right elbow. Eventually, Dr. Glenn Buterbaugh performed surgery on Plaintiff's right elbow. Since the surgery, Plaintiff's ability to lift with his right arm is limited;[4] he cannot use his right arm to push; he cannot fully extend his right arm; he experiences constant pain and two fingers and the thumb on his right hand are numb; and he constantly suffers from spasms which travel up the arm to his neck and limit the range of motion in his neck. (R. 49-51). Due to the spasms, Plaintiff's sleep is interrupted. He naps for 30 minutes to 2 hours a day.[5]  (R. 53-54).

In 2005, Plaintiff suffered two heart attacks – one in July and one in November.[6]  Plaintiff also has a history of hernia

---

3 In the past, Plaintiff also has worked as a manager for a home improvement store (April 1989 to February 1990), head valet for a banquet hall (July 1998 to June 2001), an inventory control clerk for a home furnishings company (July 2001 to March 2002) and a cashier/stock clerk (November 2003 to April 2005). (R. 133).

4 Plaintiff estimated that he could lift "10 pounds at the max" with his right arm.  (R. 54).

5 With respect to napping on a daily basis, Plaintiff testified that he had to go to sleep after eating, and that recently he had been tested for diabetes or low blood sugar.  (R. 55).

6 Plaintiff testified that he did not take any medication as a result of his heart attacks.  However, he does keep Nitroglycerin pills nearby in the event

3

surgery which continued to limit his ability to lift, bend and stoop. (R. 48-49). In addition, Plaintiff "supposedly" has arthritis and carpal tunnel syndrome in his left hand which travels to his elbow. (R. 52). Finally, Plaintiff suffers from complete hearing loss in his left ear and partial hearing loss in his right ear. (R. 55).

Plaintiff's primary care physician is Dr. Helen Monsour ("Dr. H. Monsour"). Plaintiff also is treated by Mark Abbott, D.C., a chiropractor whom he sees "a couple times a month."[7] (R. 46). As to medications, Plaintiff was taking Enalapril,[8] Equetro[9] and Aleve,[10] none of which caused any side effects. (R. 47).

**VE Testimony**

At the hearing, the ALJ asked the VE to assume a hypothetical person with Plaintiff's education, training and work experience who is limited to light work that involves only occasional gross handling and no pushing and pulling with the

---

of an emergency. (R. 53).

[7] Plaintiff testified that when his neck "gets bad," he sees Dr. Abbott 2 to 3 times a week. (R. 56).

[8] Enalapril is used alone or in combination with other medications to treat high blood pressure. www.nlm.nih.gov/medlineplus/druginfo (last visited 3/21/11) ("Medlineplus").

[9] Equetro is used with or without radiation therapy to treat a certain type of cancer of the head and neck. Medlineplus. Plaintiff's medical records indicate that he had surgery in 1991 or 1992 to remove a cancerous tumor on his parotid gland (a salivary gland situated on each side of the face below and in front of the ear). (R. 239, 312, 327, 365). www.merriam-webster.com/medlineplus (last visited 3/21/2011) ("Merriam-Webster").

[10] Aleve is an over the counter medication used to relieve pain, tenderness, swelling and stiffness caused by osteoarthritis, rheumatoid arthritis, juvenile arthritis and ankylosing spondylitis (arthritis that mainly affects the spine). Medlineplus.

4

right upper extremity.[11]  The ALJ then asked the VE whether the hypothetical person could perform any of Plaintiff's past jobs. The VE responded affirmatively, testifying that the hypothetical person could perform Plaintiff's past job as a valet parking supervisor.  The ALJ then asked the VE whether the hypothetical person could perform any other jobs in the local and national economy.  Again, the VE responded affirmatively, identifying the jobs of a hostess/ greeter, a desk attendant, a photo copy machine operator and a retail sales clerk.

Plaintiff's counsel then asked the VE whether Plaintiff could perform any of the jobs identified in response to the ALJ's hypothetical question if he was limited to only occasionally lifting 10 pounds.  The VE testified that Plaintiff could still perform the hostess/greeter and desk attendant jobs, but this further limitation would eliminate the jobs of a photo copy machine operator and retail sales clerk.  In response to further questions by Plaintiff's counsel, the VE testified that Plaintiff's inability to push and pull with his right dominant arm would not impact any of the light jobs he had identified; that the only identified job which would be eliminated if Plaintiff could not perform any fine manipulation with his right

_____

11 Under the Social Security Regulations, "[l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. §§ 404.1567(b), 416.967(b).

hand was the retail sales clerk job; that with respect to dexterity, none of the identified jobs required two hands; that none of the identified jobs required sitting more than 2 hours; and that no employer would tolerate an employee who required a 30-minute nap during the workday. (R. 56-61).

## IV. MEDICAL EVIDENCE[12]

On January 30, 2004, Plaintiff was treated at a hospital emergency room for complaints of pain in his right elbow and shoulder.[13] X-rays showed no fractures or dislocations; however, soft tissue swelling was noted at the elbow. Pain medication was prescribed for Plaintiff, and he was advised to limit his working activities to light duty. (R. 187-96). The same day, Plaintiff was seen by Dr. Geoffrey Monsour ("Dr. G. Monsour"), his primary care physician at the time. Dr. G. Monsour's diagnoses included right elbow contusion, abrasion, cellulitis and bursitis. (R. 256).

Due to continued complaints of right elbow pain, Plaintiff was referred to Dr. Rodger Searfoss, an orthopedic surgeon. During the initial office visit on February 16, 2004, Dr. Searfoss drained fluid from Plaintiff's elbow. (R. 233).

_____

12 In summarizing the medical evidence, the Court has included medical records pre-dating Plaintiff's alleged onset date of disability (April 1, 2005) for background purposes.
13 Plaintiff reported that he had slipped on ice in a parking lot going to work 25 minutes prior to his arrival at the hospital.

An MRI of Plaintiff's right elbow on May 7, 2004 revealed, among other things, a partial triceps tendon tear. (R. 258-59). On May 11, 2004, Dr. G. Monsour completed a range of motion ("ROM") chart for Plaintiff, as well a physical capacities evaluation. With regard to ROM, the only limitation noted was flexion and extension in Plaintiff's right elbow.[14] (R. 246). As to physical capacities, Dr. G. Monsour indicated, among other things, that Plaintiff could occasionally lift up to 10 pounds, and that Plaintiff could not use his right arm for repetitive pushing and pulling activities. (R. 246, 255).

Plaintiff returned to Dr. Searfoss on June 1, 2004. Because the area of the partial triceps tendon tear was markedly tender, Dr. Searfoss put Plaintiff in a long arm cast for a month. Plaintiff saw Dr. Searfoss on July 7, 2004, following removal of the cast. Plaintiff reported that his arm felt better, although he continued to have a little tenderness and soreness. Approximately two weeks later, Dr. Searfoss gave Plaintiff a trigger point injection for continued pain over his right distal triceps muscle. (R. 232-33).

On August 12, 2004, Plaintiff underwent an initial physical therapy ("PT") evaluation for right triceps muscle pain based on a referral by Dr. Searfoss. Plaintiff reported difficulty

---

14 The normal ROM in an elbow is 150 degrees, and the ROM in Plaintiff's right elbow at that time was 45 degrees. (R. 246).

lifting greater than 11 pounds and pushing with his right upper extremity. Over the course of the next 4 weeks, Plaintiff attended 7 PT sessions and "made a small amount of progression." (R. 210-218).

Plaintiff was seen by Dr. Searfoss for a follow-up visit on September 15, 2004. Plaintiff reported "at least a 50% improvement" in his pain with one sensitive area. During an office visit on November 1, 2004, Plaintiff reported definite improvement, but some aching in cold weather. Plaintiff had completed PT and did not feel his symptoms warranted surgery. Plaintiff was working, although his hours varied depending on the needs of the employer. Because Plaintiff had full range of motion and only some mild point tenderness over the epicondyle,[15] Dr. Searfoss noted that he could engage in "full activities." (R. 232).

Plaintiff was evaluated by Dr. Barry Hirsch, an ear, nose and throat specialist, on January 4, 2005. An audiogram showed mixed hearing loss in the left ear and mild sensorineural hearing loss in the right ear in the higher frequencies. (R. 324). In a questionnaire completed on February 1, 2005, Dr. Hirsch noted, among other things, that Plaintiff's inability to hear and understand normal conversational speech was limited to his left

---

[15] An epicondyle is any of several prominences on the distal part of a long bone serving for the attachment of muscles and ligaments. Merriam-Webster.

ear.  (R. 316-17).

On January 10, 2005, Plaintiff returned to Dr. Searfoss
complaining of elbow pain that was "a little different."
Plaintiff reported pain radiating downward from his right elbow
and numbness in fingers on his right hand.  Dr. Searfoss's
impression was epicondylitis,[16] and he administered a trigger
point injection in the epicondylar area.  Two weeks later,
Plaintiff returned to Dr. Searfoss with continued complaints of
numbness in two of the fingers on his right hand.  Searfoss
ordered nerve conduction studies and referred Plaintiff to Dr.
Glenn Buterbaugh, an orthopedic surgeon, for another opinion.
(R. 231).  The nerve conduction studies, which were performed on
February 14, 2005, revealed right ulnar neuropathy at the elbow.
(R. 235-36).

Plaintiff's initial evaluation by Dr. Buterbaugh took place
on March 14, 2005.  The doctor's assessment was right elbow ulnar
nerve neuropathy and he ordered an MRI to determine whether the
tear in Plaintiff's triceps muscle had healed.  Following the
MRI, Dr. Buterbaugh's assessment was (1) ulnar nerve neuropathy,
right elbow, (2) triceps tendonitis and (3) lateral

---

16 Epicondylitis is inflammation and pain over the outer side of the elbow
involving the lateral epicondyle of the humerus.  The condition is commonly
referred to as "tennis elbow."  Merriam-Webster.

epicondylitis, right elbow.[17]  Dr. Buterbaugh recommended surgery

which was performed on April 26, 2005.  (R. 237-38).

The notes of follow-up visits with Dr. Buterbaugh indicate

that Plaintiff was doing well and improving functionally (June

13, 2005); Plaintiff was doing reasonably well although his

recovery had been delayed by the lack of PT (July 18, 2005); and

Plaintiff was doing well with improving range of motion, although

his PT had been delayed due to his hospitalization for a heart

attack (September 28, 2005).[18]

On August 24, 2005, Plaintiff presented to Monsour Medical

Center reporting that he suddenly developed upper back pain, neck

pain, chest heaviness and a headache the previous day while

walking his dogs (a 150 lb. Rottweiler and a 70 lb. Labrador

Retriever) up the steps of his house.  The pain radiated to his

shoulders and down to his elbows, and he felt "sweaty all over"

and short of breath.  Plaintiff was examined by Dr. G. Monsour

who ruled out a heart attack,[19] but admitted Plaintiff for a

cardiac consultation and testing to rule out underlying coronary

---

17 The results of the MRI, which was performed on March 23, 2005, were
described as follows: 1. Possible mild tendonopathy of the triceps.  There is
no tear of the triceps tendon. 2. Mild lateral epicondylitis. 3. Small
nonspecific subchondral cyst in capitellum of the distal humerus.  (R. 364).
18 Plaintiff attended 24 PT sessions between July 4, 2005 and November 3, 2005.
From August 25, 2005 to October 4, 2005, Plaintiff's PT was interrupted due to
a heart condition.  The PT discharge summary indicates that Plaintiff met all
treatment goals.  (R. 269, 277, 280, 288, 291).
19 Plaintiff's cardiac enzymes were negative for a heart attack.  However, his
EKG showed an old septal wall heart attack.  (R. 241).

10

artery disease ("CAD"). Plaintiff was discharged the next day in stable condition and instructed to take one full strength aspirin per day. Plaintiff was given a Nicoderm patch to assist him in overcoming his nicotinism.[20]

On September 15, 2005, Dr. G. Monsour completed an Employability Assessment Form in which he indicated that Plaintiff was permanently disabled. In rendering this opinion, the doctor listed Plaintiff's primary diagnosis as "Hearing loss left & right ear" and his secondary diagnosis as "Hypertension." He did not mention any limitations resulting from Plaintiff's right elbow injury. (R. 243-44).

On October 11, 2005, Plaintiff underwent a stress test and myocardial perfusion scan for chest pain and hypertension and to rule out CAD. With regard to the stress test, Plaintiff exercised for 6.16 minutes and attained 86% of his maximum predicted heart rate. Plaintiff experienced no chest pain during the stress test; however, EKG changes were noted indicating inferior and lateral ischemia.[21] (R. 398). As to the myocardial perfusion scan, there was no evidence of reversible ischemia; Plaintiff's cardiac wall motion was normal; and his ejection

---

20 With respect to Plaintiff's nicotinism, Dr. G. Monsour's report states: "He smokes 1½ to 2 packs of cigarettes per day and has, he said, since he was 3, no kidding, he said at a very young age he started smoking. I asked if less than the age of 10 and he said definitely." (R. 239).

21 Ischemia is a deficient supply of blood to a body part (heart or brain) that is due to obstruction of the inflow of arterial blood (caused by the narrowing of arteries by spasm or disease). Merriam-Webster.

fraction was between 60% and 69%.[22]  (R. 399).

During his follow-up visit with Dr. Buterbaugh on November 23, 2005, Plaintiff's grip strength in flexion was 80 pounds on the right and 60 pounds on the left.  In extension, Plaintiff's grip strength was 75 pounds on the right and 60 pounds on the left.[23]  Plaintiff, whose PT had been discontinued by his insurer, noted continued functional use of his right arm following the surgery.  Plaintiff did, however, report some spasm over the operative site and some tenderness over the lateral epicondyle.  Dr. Buterbaugh ordered a Functional Capacity Evaluation ("FCE") to determine Plaintiff's work status.  (R. 357).

The results of the FCE, which was performed on December 7, 2005, indicated that Plaintiff could perform work at the medium level (lift/carry 20 to 50 pounds occasionally, lift/carry 10 to 25 pounds frequently, lift/carry up to 10 pounds constantly) on a full-time basis with moderate gains anticipated.  The FCE results also indicated that Plaintiff's bilateral fine motor hand skills were average, although his projected endurance was limited and he would require breaks with repetitive use.  Finally, the FCE results indicated that Plaintiff frequently could use his right

22 Ejection fraction is a measurement of the percentage of blood leaving your heart each time it contracts.  An ejection fraction between 55% and 70% is normal.  www.mayoclinic.com/health (last visited 3/21/2011).
23 Dr. Buterbaugh's deposition was taken in connection with Plaintiff's claim for workers' compensation benefits.  Dr. Buterbaugh testified that normal grip strength for Plaintiff would be 114 pounds on his dominant side and 102 pounds on his non-dominant side.  (R. 422).

hand for repetitive simple grasping, repetitive fine manipulation and feeling objects using his fingertips, and that Plaintiff occasionally could use his right hand for repetitive pushing and pulling, prolonged firm grasp and in the presence of vibrating equipment. (R. 340-47). During a follow-up visit the same day, Dr. Buterbaugh noted that his examination of Plaintiff was consistent with the results of the FCE."[24] (R. 339).

Plaintiff noted continued spasms in his right arm during a visit with Dr. Buterbaugh on January 11, 2006. Nerve studies conducted that day were normal. Plaintiff's physical examination revealed full composite grasp, but "some tightness over his extensor as well as flexor origin." Dr. Buterbaugh noted that Plaintiff was on light duty status; however, he was not working at that time. Dr. Buterbaugh prescribed a muscle relaxant for Plaintiff to use when he was symptomatic. (R. 337).

On January 18, 2006, Plaintiff was evaluated by Dr. Augusto Sotelo in connection with his hearing loss. Dr. Sotelo noted that Plaintiff has a history of chronic otitis media with

_____

24 On December 7, 2005, Dr. Buterbaugh also signed a Functional Capacity Checklist indicating that Plaintiff should never perform work involving ladders or unprotected heights; that Plaintiff had a severe problem with pressure tolerance in his right elbow; that Plaintiff could only occasionally engage in pushing and pulling activities, prolonged firm grasping and the use of vibrating machines with his right hand; that Plaintiff could perform the physical demands of work at the medium level; and that Plaintiff could safely lift 25 pounds occasionally. (R. 348).

13

effusion ("OME"),[25] and he removed a ventilating tube that had been positioned in Plaintiff's left ear for 15 years. Dr. Sotelo also noted that Plaintiff had a "medium size perforation of the left tympanic membrane."[26] An audiogram revealed moderately severe to profound hearing loss in Plaintiff's left ear. As to his right ear, the audiogram was essentially within normal limits to 1000 Hz and showed mild to moderately severe hearing loss at high frequencies. Dr. Sotelo recommended repair of the perforation in Plaintiff's left tympanic membrane. Although the repair would not improve Plaintiff's hearing loss in that ear, Dr. Sotelo noted that it would prevent repeat infections. (R. 294-95). Dr. Sotelo performed the left tympanomastoidectomy on February 9, 2006. (R. 312-313).

Plaintiff reported significant stiffness during his follow-up visit with Dr. Buterbaugh on March 6, 2006. His grip strength was 20 pounds on the right and 50 pounds on the left. Plaintiff's cervical range of motion also was limited. Because Plaintiff continued to be limited due to his right elbow pain, Dr. Buterbaugh indicated that he would not change Plaintiff's light duty work release status. (R. 336).

---

25 A person with OME has thick or sticky fluid behind the eardrum in the middle ear, but no ear infection. When the Eustachian tube, which connects the inside of the ear to the back of the throat, is partially blocked, fluid builds up in the middle ear. Bacteria that are already inside the ear become trapped and begin to grow, which may lead to an ear infection. Medlineplus.
26 The tympanic membrane is also called the eardrum. It separates the outer ear from the middle ear. Medlineplus.

On March 14, 2006, Dr. Abbott completed a report concerning his chiropractic treatment of Plaintiff. Dr. Abbott indicated that he had first seen Plaintiff on October 28, 2004; that he had last seen Plaintiff on June 28, 2005; that he saw Plaintiff on an "as needed" basis; that activities of daily living incite Plaintiff's pain which is relieved by chiropractic adjustments; that Plaintiff's condition is aggravated by prolonged lifting and overhead reaching; that Plaintiff's motor strength was 4/5; and that Plaintiff's prognosis was favorable. (R. 368-71). With regard to Plaintiff's ability to perform work-related physical activities, Dr. Abbott opined that Plaintiff could frequently lift 2-3 pounds and occasionally lift 20 pounds; that Plaintiff was limited in his upper extremity; and that Plaintiff's ability to reach was impaired. (R. 372-73).

On April 5, 2006, Plaintiff underwent a myocardial perfusion stress test for chest pain, hypertension and a family history of CAD. The conclusion was described as follows: 1. Adequate stress test to submaximal heart rate, positive for exercise induced ischemia EKG changes without angina or arrhythmia, 2. Good exercise tolerance and 3. Normal blood pressure response. The myocardial images obtained during the test showed no reversible ischemia and normal left ventricular function. (R. 393-94).

During an office visit on May 1, 2006, Dr. Buterbaugh noted

that Plaintiff remained "essentially unchanged." His grip strength was 70 pounds on the right and 95 pounds on the left. The doctor continued Plaintiff's light duty work release status. (R. 480). Following an office visit on July 24, 2006, Dr. Buterbaugh noted that Plaintiff was "stable." His grip strength was 80 pounds on the right and 90 pounds on the left. (R. 479).

On July 25, 2006, Dr. Abu Ali, a State agency medical consultant, completed a Physical RFC Assessment based on a review of Plaintiff's medical records. Dr. Ali listed Plaintiff's primary diagnosis as chronic otitis media with tympanic membrane perforation and hearing loss in both ears, and his secondary diagnosis as right epicondylitis with ulnar neuropathy. With respect to exertional limitations, Dr. Ali opined that Plaintiff could occasionally lift/carry 20 pounds, frequently lift/carry 10 pounds, stand and/or walk about 6 hours in an 8-hour workday, sit about 6 hours in an 8-hour workday and was not limited in his ability to push and/or pull with his upper and lower extremities. Dr. Ali further opined that Plaintiff had communicative limitations due to his hearing loss, but that he had no postural, manipulative, visual or environmental limitations. (R. 400-06).

On September 25, 2006, Plaintiff underwent surgery to repair a recurrent left inguinal hernia using a PHS patch.[27] Plaintiff

_____

27 Plaintiff's initial repair of the left inguinal hernia was performed

16

tolerated the procedure well and was taken to the recovery room in good condition. (R. 484).

X-rays of Plaintiff's chest and abdomen on May 30, 2007 were normal. (R. 501-02).

Dr. H. Monsour completed a report concerning her treatment of Plaintiff on September 4, 2007, in which she noted Plaintiff's limitations in pushing with his right arm and gripping with his right hand; his profound hearing loss in the left ear; and his hearing loss in the right ear. The doctor described Plaintiff's prognosis as "poor," and indicated that he has a permanent disability. Despite the poor prognosis and permanent disability, the doctor rendered the opinion that Plaintiff could engage in employment "on a regular, sustained, competitive and productive basis." (R. 407-09).

In a Physical Capacities Evaluation completed on September 4, 2007, Dr. H. Monsour indicated, among other things, that Plaintiff could occasionally lift up to 10 pounds, but never 11 to 20 pounds; that Plaintiff could not use his right hand for simple grasping, pushing and pulling, or fine manipulations; that Plaintiff could not reach above his shoulder level with the right arm; that Plaintiff suffers from moderate pain; and that Plaintiff would never need rest periods during the day or miss

---

laparoscopically in 2000. (R. 492).

work due to exacerbations of pain.[28]   (R. 410-11).

## V. ALJ'S DECISION

In order to establish a disability under the Social Security
Act, a claimant must demonstrate an inability to engage in any
substantial gainful activity due to a medically determinable
physical or mental impairment which can be expected to result in
death or which has lasted or can be expected to last for a
continuous period of not less than 12 months.   See 42 U.S.C.
§ 423(d)(1).   A claimant is considered unable to engage in any
substantial gainful activity only if his physical or mental
impairment or impairments are of such severity that he is not
only unable to do his previous work but cannot, considering his
age, education, and work experience, engage in any other kind of
substantial gainful work which exists in the national economy.
See 42 U.S.C. § 423(d)(2)(A).

When presented with a claim for disability benefits, an ALJ
must follow a sequential evaluation process.   See 20 C.F.R.

---

28 Plaintiff's counsel submitted additional medical evidence to the Appeals
Council in connection with Plaintiff's request for review of the ALJ's
decision.   The evidence relates to three episodes of fainting between November
2009 and March 2010.   Plaintiff was evaluated by Dr. Carlos Marrero, who
diagnosed Plaintiff with syncope and ordered an EEG.   The EEG, which was
performed on February 9, 2010, was normal.   (R. 505-15).   The Court notes that
the additional evidence submitted to the Appeals Council relates to tests and
treatment occurring between February and April 2010.   However, Plaintiff's
insured status for purposes of DIB expired on September 30, 2009, and, to be
eligible for SSI, Plaintiff was required to show that he was disabled as of
the date of the ALJ's decision on November 29, 2007.   While the additional
evidence submitted to the Appeals Council would be relevant to a new
application for SSI, it has no bearing on the decision in this case.

§§ 404.1520(a)(4), 416.920(a)(4). The process was described by the United States Supreme Court in <u>Sullivan v. Zebley</u>, 493 U.S. 521 (1990), as follows:

\* \* \*

Pursuant to his statutory authority to implement the SSI Program, (footnote omitted) the Secretary has promulgated regulations creating a five-step test to determine whether an *adult* claimant is disabled. <u>See</u> <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). (footnote omitted). The first two steps involve threshold determinations that the claimant is not presently working and has an impairment which is of the required duration and which significantly limits his ability to work. <u>See</u> 20 C.F.R. §§ 416.920(a) through (c)(1989). In the third step, the medical evidence of the claimant's impairment is compared to a list of impairments presumed severe enough to preclude any gainful work. <u>See</u> 20 C.F.R. pt. 404, subpt. P, App. 1 (pt. A)(1989). If the claimant's impairment matches or is "equal" to one of the listed impairments, he qualifies for benefits without further inquiry. § 416.920(d). If the claimant cannot qualify under the listings, the analysis proceeds to the fourth and fifth steps. At these steps, the inquiry is whether the claimant can do his own past work or any other work that exists in the national economy, in view of his age, education, and work experience. If the claimant cannot do his past work or other work, he qualifies for benefits. §§ 416.920(e) and (f).

\* \* \*

493 U.S. at 525-26.

The claimant bears the burden of establishing steps one through four of the sequential evaluation process. At step five, the burden shifts to the Commissioner to consider "vocational factors" (the claimant's age, education and past work experience) and determine whether the claimant is capable of performing other

19

jobs existing in significant numbers in the national economy in light of his or her RFC. Ramirez v. Barnhart, 372 F.2d 546, 550-51 (3d Cir.2004).

With respect to the ALJ's application of the five-step sequential evaluation process in the present case, steps one and two were resolved in Plaintiff's favor: that is, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged onset date of disability, and the medical evidence established that Plaintiff suffers from the following severe impairments: right epicondylitis status post epicondylar release surgery, right ulnar neuropathy status post submuscular ulnar nerve transposition with ulnar neurolysis, left carpal tunnel syndrome, CAD with residuals of myocardial infarction and hypertension, and chronic otitis media with a mixed left hearing loss and a sensorineural right hearing loss. (R. 19-20).

Turning to step three, the ALJ found that Plaintiff's impairments were not sufficiently severe to meet or equal the requirements of any impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1, and, in particular, Listing 1.00 relating to the musculoskeletal system, Listing 2.00 relating to special senses and speech, and Listing 4.00 relating to the cardiovascular system. (R. 20).

Before proceeding to step four, the ALJ assessed Plaintiff's

RFC, concluding that Plaintiff retained the RFC to perform work at the light exertion level, except work which requires gross handling or pushing and pulling with the upper right extremity. (R. 20-26). The ALJ then proceeded to step four, finding that in light of Plaintiff's RFC, he is capable of performing his past job as a valet parking supervisor. (R. 27-28).

Based on her conclusion at step four that Plaintiff could perform past relevant work, the ALJ did not have to proceed to step five. Nevertheless, she noted that the VE identified additional jobs Plaintiff could perform based on his RFC, including the jobs of a hostess/greeter, a desk attendant, a photocopy machine operator and a retail sales clerk. (R. 28).

## VI. STANDARD OF REVIEW

The Court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence, which has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). It consists of something more than a mere scintilla, but something less than a preponderance. Dobrowolsky v. Califano, 606 F.2d 403, 406 (3d Cir.1979). Even if the Court would have decided the case differently, it must accord deference to the Commissioner and affirm the findings and decision if supported by substantial

evidence.  <u>Monsour Medical Center v. Heckler</u>, 806 F.2d 1185, 1190-91 (3d Cir.1986).

## VII. ANALYSIS

### RESIDUAL FUNCTIONAL CAPACITY

Initially, Plaintiff asserts that the ALJ improperly assessed his RFC.  In support of this argument, Plaintiff claims that the ALJ erred in two respects: (1) by failing to give controlling weight to the opinions of Dr. G. Monsour, Dr. H. Monsour and Dr. Abbott regarding his physical limitations and (2) in finding that his statements concerning the intensity, persistence and limiting effects of his symptoms were not entirely credible.

#### Opinions of Treating Sources

If a treating source's opinion on the nature and severity of a disability claimant's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, it is entitled to controlling weight.  <u>See</u> 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

Turning first to Dr. G. Monsour, Plaintiff notes that on May 7, 2004, the findings of an MRI ordered by Dr. G. Monsour showed a partial triceps tendon tear and avulsion fracture of the olecranon.  Moreover, on May 11, 2004, Dr. G. Monsour diagnosed

Plaintiff with bursitis, pain and weakness; noted the significant ROM limitation in Plaintiff's right elbow; and opined that Plaintiff could only occasionally lift up to 10 pounds. (Docket No. 9, p. 7). Finally, Plaintiff notes that Dr. G. Monsour "reported that [Plaintiff] would need rest periods during the day and that [Plaintiff] would probably miss work due to exacerbations of pain." (Docket No. 9, p. 11).

After consideration, the Court finds no error in the failure of the ALJ to give controlling weight to the opinions of Dr. G. Monsour concerning the limitations resulting from Plaintiff's right elbow injury. Dr. G. Monsour's opinions were rendered almost a year before Plaintiff alleges that he became disabled and before Plaintiff's right elbow surgery by Dr. Buterbaugh. Thus, the opinions are irrelevant with regard to Plaintiff's applications for DIB and SSI.[29] In addition, the opinions are not supported by objective medical findings and are inconsistent with other substantial evidence in the record.

As to Dr. H. Monsour, Plaintiff notes that, on September 4, 2007, the doctor reported that his limitations included an inability to push with his right arm and grasp with his right hand; that he could only occasionally lift up to 10 pounds; and

---

29 Significantly, Dr. G. Monsour's office records for December 21, 2004 indicate that Plaintiff had been performing his regular employment on a full-time basis since September 15, 2004, despite his right elbow injury. (R. 249).

23

that he could not use his right hand for simple grasping, pushing and pulling and fine manipulating. (Docket No. 9, p. 9). Contrary to Plaintiff's position, the Court concludes that the ALJ did not err by failing to give controlling weight to the foregoing opinions of Dr. H. Monsour.

First, Plaintiff fails to acknowledge that on the same day Dr. H. Monsour reported the above-cited limitations, she also rendered the opinion that Plaintiff could engage in employment on a regular, sustained, competitive and productive basis. (R. 409). Second, the opinions regarding Plaintiff's limitations are not supported by any objective medical findings by Dr. H. Monsour. In fact, the treatment records of Dr. H. Monsour in the record are sparse. Finally, the opinions rendered by Dr. H. Monsour concerning the extent of the limitations resulting from Plaintiff's right arm injury are clearly inconsistent with other substantial evidence in the record. For example, the FCE completed in December 2005 indicated that Plaintiff retained the lifting and carrying ability for medium work; that Plaintiff was capable of using his right hand for moderate hand strength tasks; that Plaintiff's right hand performed with good accuracy and average speed with regard to fine motor tasks; and that Plaintiff could occasionally engage in repetitive pushing and pulling activities. Although Plaintiff cites some of the FCE findings

24

tending to support his claim of significant limitations from his right arm injury (Docket No. 9, pp. 8-9), he fails to mention any of the above-cited findings. In addition, Plaintiff fails to mention the ultimate conclusion of the FCE that, although he could not perform his past job as a cashier/stocker at a Sunoco station because it involved heavy work, he could perform a job at the medium level of exertion. (R. 346).

Also, the opinion of Dr. H. Monsour conflicts with the opinion of Dr. Buterbaugh, the orthopedic surgeon who performed Plaintiff's right elbow surgery in April 2005. Dr. Buterbaugh specifically agreed with the results of the FCE, recommending that it was safe for Plaintiff to lift and carry 25 pounds on an occasional basis; frequently engage in repetitive simple grasping and fine manipulation; and occasionally engage in repetitive pushing and pulling. (R. 348). Not surprisingly, Plaintiff fails to mention Dr. Buterbaugh's contrary opinion, arguing erroneously, instead, that "it was clearly error for the ALJ to reject uncontradicted medical evidence." (Docket No. 9, p. 18). Further, Dr. Buterbaugh is a specialist, and the opinion of a specialist about medical issues related to his or her area of specialty generally will be given more weight than the opinion of a source who is not a specialist. See 20 C.F.R. §§ 404.1527(d)(5), 416.927(d)(5). Thus, the ALJ was justified in

giving more weight to the opinion of Dr. Buterbaugh.

Finally, the Court concludes that the ALJ did not err by failing to give controlling weight to the opinion of Dr. Abbott who, as Plaintiff notes, rendered an opinion on March 14, 2006 that Plaintiff could only frequently lift 2 to 3 pounds and that his ability to reach was adversely affected by his impairment. (Docket No. 9, p. 16). While the opinion of a treating chiropractor is entitled to some weight in determining whether a claimant is disabled, a chiropractor is not "an acceptable medical source" under the Social Security Regulations. As a result, the opinion of a chiropractor is never entitled to controlling weight. See Hartranft v. Commissioner, 181 F.3d 358, 361 (3d Cir.1999).

In any event, like the opinions of Dr. G. Monsour and Dr. H. Monsour, Dr. Abbott's opinion is not supported by any objective medical findings and is inconsistent with other substantial evidence in the record precluding controlling weight. In this connection, the Court also notes that the questionnaire completed by Dr. Abbott on March 14, 2006 indicates that he had not seen Plaintiff since June 28, 2005, almost nine months before his opinion was rendered.

## Credibility Determination

Whenever a disability claimant's statements about the
intensity, persistence or functionally limiting effects of pain
and other symptoms are not substantiated by objective medical
evidence, the ALJ must make a finding on the credibility of the
claimant's statements based on a consideration of the entire case
record. See Social Security Ruling 96-7p.[30] Plaintiff maintains
the ALJ erred by failing to find that his statements concerning
totally disabling symptoms were entirely credible. The Court
does not agree.

Plaintiff testified during the hearing that he suffers from
constant pain and spasm in his right arm; that he experiences
numbness in two fingers and the thumb of his right hand at times;
that the pain travels to his neck and he cannot turn his head to
the right; that his elbow is "real sensitive" when bumped; that
he experiences pain in his left arm when the weather turns cold;
that he takes 30-minute to 2-hour naps during the day due to
interrupted sleep from pain; and that he is totally deaf in the
left ear and losing his hearing in the right ear. (R. 50-56).

In finding that Plaintiff's testimony regarding the
intensity, persistence and limiting effects of his symptoms was

---

30 Social Security Rulings are agency rulings published "under the authority of
the Commissioner of Social Security" and "are binding on all components of the
Social Security Administration." Sykes v. Apfel, 228 F.3d 259, 271 (3d Cir.
2000).

not entirely credible, the ALJ relied on the following evidence
or lack thereof:

(1) Plaintiff's self-reported activities of daily living
("ADLs");

(2) at the time of the hearing Plaintiff had been working 25
to 40 hours per week for 2½ months;

(3) there was no evidence of muscle atrophy upon physical
examination, suggesting that Plaintiff moves about on a fairly
regular basis despite complaints of disabling symptomatology;

(4) the inconsistency between Plaintiff's allegations of
totally debilitating symptomatology and the clinical and
objective findings, including (i) treatment notes, (ii) the
results of the FCE performed in December 2005, (iii) the normal
nerve conduction studies performed in January 2006, (iv) the
results of the cardiac testing performed in April 2006, (v) the
normal chest x-ray in May 2007, (vi) the results of the audiogram
in February 2005 showing only a mild sensorineural hearing loss
at higher frequencies in the right ear, (vii) Dr. Hirsch's
notation in February 2005 that Plaintiff was able to hear and
understand normal conversational speech with his right ear, and
(viii) the lack of any medical records indicating that Plaintiff
suffered from significant fatigue;

(5) the type of medication prescribed for Plaintiff and his

28

denial of side effects;

(6) the lack of aggressive treatment for pain;

(7) Plaintiff's ability to hear and answer questions during the hearing with only mildly elevated voices; and

(8) Plaintiff's earnings records which "simply do not paint a picture of an individual with a strong motivation to work." (R. 24-26).

Plaintiff asserts that the ALJ erred by relying on his ADLs to find his complaints of disabling pain not entirely credible. In this connection, Plaintiff notes that sporadic and transitory activities cannot be used to show an ability to engage in substantial gainful activity. Fargnoli v. Massanari, 247 F.3d 34, 41 n.5 (3d Cir.2001). After consideration, the Court finds that Plaintiff's self-reported ADLs cannot be characterized as "sporadic and transitory activities." Thus, the ALJ did not err by taking Plaintiff's ADLs into consideration in her credibility determination.

As noted by the ALJ, in the ADL questionnaire completed by Plaintiff on February 24, 2006, he reported that two dogs depend on him to feed and walk them; that his condition has not required him to depend on someone else for care; that he drives every day; that he mows the lawn with his left hand; that he takes the trash out one bag at a time; that he vacuums and performs other

29

housework with his left arm; that he does his own grocery shopping and can carry two bags at a time with his left arm; that he can do the laundry; and that he does not need to take rests between activities. (R. 156-58). In addition, the ALJ noted that at the time of the hearing, Plaintiff had been working 25 to 40 hours per week for a pharmacy for 2½ months. Simply put, this is not a case where the ALJ impermissibly relied upon sporadic and transitory activities to bolster an adverse credibility determination.

Plaintiff also argues that the ALJ improperly discredited his subjective allegations of pain due to a lack of objective medical findings to support the allegations. The Court may have agreed with this argument if the ALJ's credibility determination had been based solely on the lack of such findings. However, as noted above, the ALJ considered the entire record in concluding that Plaintiff's statements regarding the severity of his pain were not entirely credible. Although Plaintiff asserts that he suffers from "chronic pain syndrome" (Docket No. 9, p. 13), the ALJ noted the type of medications taken by Plaintiff,[31] the minimal pain treatment that has been prescribed for Plaintiff and Dr. Buterbaugh's deposition testimony in June 2006 in which he

_____

[31] As noted previously, Plaintiff testified that he took over the counter medication (Aleve) to control his pain. (R. 47).

characterized Plaintiff's pain level as mild to moderate.[32]  (R.
25).  Under the circumstances, the Court finds this argument
unpersuasive.

Plaintiff also argues that the ALJ erred by considering his
"sparse work history" in making her credibility determination.
Again, the Court finds Plaintiff's argument unpersuasive.  Social
Security Ruling 96-7p specifically includes prior work record
among the factors to be considered in evaluating the credibility
of a disability claimant's statements.  See also Schaal v. Apfel,
134 F.3d 496 (2d Cir.1998)(ALJ could consider claimant's poor
work history in evaluating her credibility in social security
disability case); Dobrowolsky v. Califano, 606 F.2d 403 (3d
Cir.1979)(Testimony of social security disability benefits
claimant as to his capabilities was entitled to substantial
credibility where claimant had a work record of 29 years of
continuous employment, 15 years with the same employer).
Accordingly, the ALJ's consideration of Plaintiff's sporadic work
history was proper.

Finally, Plaintiff asserts that the ALJ erred in discounting
his credibility based on her observation of him during the
hearing.  Plaintiff argues that although an ALJ may consider
personal observations made during the hearing, "they cannot be

_____

32 With respect to pain level, the Court notes that Dr. H. Monsour also
reported that Plaintiff's pain is "moderate."  (R. 410-11).

31

used to override medical opinions that are supported by the record." (Docket No. 9, p. 14). Again, the Court finds Plaintiff's argument unpersuasive.

The only personal observation of the ALJ that was taken into consideration in making the credibility determination in this case related to Plaintiff's hearing loss. The ALJ noted in her decision that Plaintiff "was able to hear and answer questions without the use of any hearing aid and with only mildly elevated voices." (R. 22). The ALJ's observation clearly did not "override" any medical opinion in the record. In fact, the observation was entirely consistent with the other medical evidence regarding Plaintiff's hearing loss. Specifically, as noted by the ALJ, an audiogram in February 2005 revealed only a mild sensorineural hearing loss in Plaintiff's right ear at higher frequencies and Dr. Hirsch noted Plaintiff's ability to hear and understand normal conversational speech with his right ear. (R. 27).

## ADEQUACY OF ALJ'S HYPOTHETICAL QUESTION

As noted previously, the ALJ asked the VE to assume a hypothetical person with Plaintiff's education, training and work experience who is limited to light work that involves only occasional gross handling and no pushing and pulling with the right upper extremity. Plaintiff contends that the hypothetical

32

question did not include all of his limitations, and, therefore, the VE's testimony that Plaintiff could perform his past job as a valet parking supervisor, as well as other light work, based on that hypothetical question does not constitute substantial evidence supporting the ALJ's adverse decision in this case. See Ramirez v. Barnhart, 372 F.3d 546, 552 (3d Cir.2004)(ALJ's hypothetical question to VE did not accurately convey all of disability claimant's impairments and the limitations they caused, and, therefore, the ALJ's decision denying SSI was not supported by substantial evidence).

After consideration, the Court finds Plaintiff's argument regarding the adequacy of the ALJ's hypothetical question to be meritless. Although Plaintiff maintains that "[i]t is apparent in this hypothetical question to the VE that the ALJ did not consider the medical impairments set forth by [his] treating health care providers" (Docket No. 9, p. 19), he fails to identify the impairments that are alleged to have been omitted. In sum, the Court agrees with the Commissioner that the ALJ's hypothetical question adequately accommodated the limitations supported by the medical evidence in the record. (Docket No. 11,

p. 22).

        Based on the foregoing, the ALJ's decision will be affirmed.

                                William L. Standish
                                William L. Standish
                           United States District Judge

Date: March _28_, 2011